[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
In this case the pervading question is whether the defendant Mary Gaffney can be held liable to the plaintiffs because of CT Page 5865 contracts negotiated by Joseph Gaffney her former husband. The plaintiffs' causes of action are embodied in an amended complaint of six counts. Count 1 is against Joseph Gaffney only and alleges an unsatisfied Rhode Island judgment in the amount of $134,369.50. Count 2 recites that on September 10, 1983 the plaintiffs and Joseph Gaffney entered into a contract that Joseph subsequently assigned to Denise Barnes and that on or about January 19, 1992, the defendant (Joseph Gaffney) tortiously interfered with the contract by instructing Denise Barnes to send payments to Mary Gaffney instead of to the plaintiffs. Count 3 alleges that both Joseph and Mary Gaffney are indebted to the plaintiffs in the sum of $10,000.00 because of a loan made in Rhode Island on June 23, 1989. Count 4 refers to a contract pertaining to the Amateur Duckpin Tour that the plaintiffs claim they made with Joseph Gaffney on or about February 22, 1986. Count 5 refers to another contract, this one pertaining to the Amateur Candlepin Tour, that the plaintiffs allege they entered into with Joseph and Mary Gaffney on or about October 18, 1985. Finally Count 6 purports to be based on two contracts, one made on or about December 26, 1986 and the other made on about January 10, 1987 by the plaintiffs and Joseph and Mary Gaffney concerning the Amateur Bowlers Tour, Washington Division.
Joseph Gaffney has a middle initial of "C" and is described in some of the contracts as "Chet Gaffney." In this action he was served but never filed an answer and did not appear at the trial. A judgment was entered against him in the amount of $141,950.00.
In Mary Gaffney's answer to the plaintiffs' amended complaint, she did not respond to Counts 1, 2 and 4 on the ground that they were not addressed to her. She denied the relevant portions of Counts 3, 5 and 6. The court agrees with her position as such to Count 1. Her nonresponse to Counts 2 and 4 were treated as denials.
 I.
From the evidence produced at the trial, including reasonable inferences therefrom, the court finds that the following facts were established. In 1983, Joseph Gaffney was an originator and promoter of bowling tournaments. In April or May of that year, at an Amateur Bowlers Tour in Cranston, Rhode Island, Joseph Gaffney approached the plaintiffs about becoming backers of bowling tournaments referred to by people involved with them as "tours." CT Page 5866
The first tour in which the plaintiffs were backers was the Amateur Bowlers Tour, Massachusetts or Northern Division. They made money in addition to being repaid for their investment. About this time, Joseph Gaffney introduced Mary to the plaintiffs as his girl friend. The two couples became close friends and the plaintiffs were guests at the wedding of Joseph to Mary in 1984. At the time of trial in December, 1995, Joseph and Mary had been recently divorced.
Buoyed by the success of their initial investment the plaintiffs decided to become backers of more of Joseph Gaffney's bowlers' tours. Five written contracts and three oral agreements were entered into. The written contracts were short documents that had been prepared by Joseph Gaffney. For each contract, the plaintiffs have performed their obligation in that they had paid the amount of money required by the document. At the trial, the written contracts were introduced as plaintiff's exhibits "B," "F," "J," "M," and "LL."
Exhibit "B" is the contract pertaining to the plaintiffs' investment in the Southern (Connecticut) Division of the Amateur Bowlers Tour. The contract provided that for their investment of $20,000.00, the plaintiffs would receive a royalty of 50¢ per entry and in five years after January 7-8, 1984 an option to sell their interest for $25,000.00. A correlative option to buy on the same date was given to "Chet" Gaffney. Royalty checks were to be mailed no later than seven days after the conclusion of each tournament, starting with a tournament to be held on January7-8, 1984. The contract also provides that if "Chet" Gaffney were to sell the Amateur Bowlers Tour, it would be sold subject to his agreement with the plaintiffs. Exhibit "B" was signed by both plaintiffs and Joseph C. Gaffney on September 10, 1983. In Exhibit "B", the plaintiffs are described as investors and Joseph C. Gaffney is described as the "owner of the ABT."
On July 7, 1988 while the Southern (Connecticut) Division Tour was in progress, the plaintiffs invested an additional $20,000.00 upon an oral understanding that they would receive royalties of 50¢ per entry for the "life of the tour," meaning for as long as the Southern Division operates. Denise Barnes who purchased the Southern Division from Joseph Gaffney on February 1, 1985, paid the plaintiffs, pursuant to Exhibit "B" the amount of $25,000.00. The plaintiffs have also recouped their additional investment of $20,000.00 through royalty payments at the rate of 50¢ per entry. In 1992, however, the royalty CT Page 5867 payments ceased although the Southern Division is still operating.
Exhibit "F" is the contract pertaining to the plaintiffs' investment in the Washington Division of the Amateur Bowlers Tour. The contract provides that for their investment of $20,000.00, the plaintiff Catherine Guillemette would receive a royalty of 50¢ per entry with checks for the royalties to be mailed no later than seven days after the conclusion of each tournament the first of which would occur in January, 1987. Exhibit "F" also provides that on anniversary dates (two years and five years from the date of the first tournament) the plaintiffs would have the opportunity to sell their interest for $20,000.00 and "Chet" Gaffney would have the option to purchase the plaintiffs' interest for the same amount. Like Exhibit "B," Exhibit "F" states that should the Amateur Bowlers Tour be sold, it would be sold subject to the parties' agreement. Finally, Exhibit "F" has a liquidated damages clause. If the plaintiffs were to breach the contract before two years, they would receive $20,000.00 minus any payments that had been made to them. If the plaintiffs' breach were to occur after two years and before five years, they would receive $20,000.00 minus any payments made to them after two years. If "Chet" Gaffney were the breaching party, the plaintiffs would receive $20,000.00 plus $2,500.00 and would keep the payments they had received. Exhibit "F" was signed by both plaintiffs and by "Chet" Gaffney and Mary C. Gaffney on December 26th, 1986.
Exhibit "J" is another contract pertaining to a second investment made by the plaintiffs in the Washington Division of the Amateur Bowlers Tour. The contract provides that for their investment of $30,000.00, the plaintiff Catherine Guillemette will be sent a royalty of 75¢ per entry not later than seven days after the completion of each tournament with the first tournament scheduled for January 17-18, 1987. Another provision is the option of "Chet" Gaffney to "buy back" the plaintiffs' interest for $30,000.00 on the fifth anniversary of the contract. As with Exhibits "B" and "F," Exhibit "J" also provides that should the Amateur Bowlers Tour be sold, the sale would be subject to the parties' agreement. And like Exhibit "F," Exhibit "J" has a liquidated damages clause. If the plaintiffs breach the contract before five years, they would be given their $30,000.00 minus any payments that they received. If "Chet" Gaffney should breach the contract, he would pay the plaintiffs $30,000.00 together with the payments they had received and $5,000.00. CT Page 5868 Exhibit "J" was signed on January 10, 1987 by both plaintiffs and by "Chet" Gaffney and Mary Gaffney.
Exhibit "M" is typed on stationery of the Amateur Candlepin Tour. It is a contract pertaining to the plaintiffs' investment in the Amateur Candlepin Tour and in the Baltimore Division of the Amateur Bowlers Tour. The contract provides that for their investment of $20,000.00 the plaintiffs would receive a royalty payment of 25¢ per entry from Chet Gaffney and/or Mary Gaffney within seven days after each tournament of both the ACT and ABT (Baltimore Division). In a manner similar to the other contracts, Exhibit "M" provides that two years and five years from the date of the first check, the plaintiffs have the option to sell their interest in the ACT and ABT for $20,000.00 and "Chet" and/or Mary Gaffney will have a reciprocal option to repurchase. The liquidated damage clause of Exhibit "M" is somewhat different from the clauses in Exhibits "F" and "J" reads "Should either party wish to break this agreement other than on the specified dates, the following would take place. If [the plaintiffs] were the party to break the agreement, they would receive their $20,000.00 back less any payments that were made to them. If Chet and/or Mary Gaffney were the party to break the agreement, they would pay $20,000.00 plus $5,000.00. After [two years from the date of the first check, the plaintiffs] would have no forfeiture penalties." Like Exhibits "B," "F" and "J," Exhibit "M" specifies that a sale of the division would be subject to its provisions. But Exhibit "M" also provides that if Chet Gaffney should open another division, the plaintiffs would have the first option to invest in it. Exhibit "M" was signed on October 18, 1985 by the plaintiffs who have the word "investor" printed next to their names and by Joseph C. Gaffney and Mary C. Gaffney who have the word "owner" printed next to each of their names.
Exhibit "LL," the last contract to be introduced, was signed by the plaintiffs and "Chet" Gaffney on February 22, 1986. Exhibit "LL" provides that for their investment of $20,000.00, of which $2,500.00 was paid on February 22, 1986; $7,500.00 on March 15, 1986 and $10,000.00 on August 2, 1986, the plaintiffs would receive a royalty of 50¢ per entry to be mailed within seven days after the conclusion of each tournament held by the Baltimore Division of the Amateur Duckpin Tour. The first tournament was scheduled for Memorial Day Weekend, 1986. As with the other contracts, Exhibit "LL" also provides that on dates two and five years after the first tournament the plaintiffs have the CT Page 5869 option to sell their interest in the Amateur Duckpin Tour for $20,000.00. On the same dates, Chet Gaffney is given the option of buying the plaintiffs' interest for the same price. Like the other contracts, Exhibit "LL" has a provision for liquidated damages. If within two years, the plaintiffs should breach the contract they would receive their $20,000.00 minus any payments that had been made to them. If the plaintiffs' breach should occur after two years but before five years, the plaintiffs would receive their investment of $20,000.00 minus any payments made to them after two years. Should Chet Gaffney be the breaching party, the plaintiffs would be given their investment of $20,000.00, keep the payments that they had received and be paid an additional $2,500.00. Finally, Exhibit "LL" provides, as do the other contracts, that if the Amateur Duckpin Tour is sold, the sale would incorporate the contract's provisions.
The address of the Amateur Duckpin Tour is stated on Exhibit "LL" to be P.O. Box 657, Reisterstown, Maryland 21136. The address for the Amateur Bowlers Tour, as shown in Exhibit "B" is 27 Pleasant Street, Brockton, Massachusetts 02401 and; Exhibit "M" as P.O. Box 950, Brockton, Massachusetts 02403. The address of the Amateur Candlepin Tour is, as shown in Exhibit "M", the same Brockton postal box.
The Amateur Bowlers Tour is a nationwide organization with headquarters in Westminster, California. The national organization operates on a franchise system whereby someone such as Joseph Gaffney receives authorization to set up tournaments using the name of Amateur Bowlers Tours in various cities and states. There is no requirement, however, that contracts between the promoter and his backers or the promoter and his purchasers be filed at national headquarters. The Brockton addresses, shown on Exhibits "B" and "M", referred to Joseph Gaffney's former residence. After Joseph married Mary in 1984, the headquarters for the various amateur bowlers tours that were started and being promoted by Joseph was 1243 Yale Avenue in Wallingford, where he lived with Mary until a specific tour was sold.
Joseph Gaffney also funded, promoted, secured backing for, and sold bowlers' tours that, according to Mary Gaffney, were not franchises of the Amateur Bowlers Tour. These were the Amateur Candlepin Tour, part of Exhibit "M", and the Amateur Duckpin Tour, Exhibit "LL". Although Exhibit "LL" states that Reisterstown, Maryland is headquarters for the Duckpin Tour, much work for that tour and the candlepin tour as well was done in CT Page 5870 Wallingford, Connecticut.
Mary testified that she was Joseph's "Go-for" and described her duties as going to the post office, licking stamps, distributing and collecting bowlers' sheets and serving as a stake-holder for side bets made between tournament participants and viewers. The evidence, however, disclosed that she had other duties more managerial in nature. For the National Duckpin Tour which consisted of at least a New England division and a Baltimore area division, Mary Gaffney kept the checkbook, made deposits to the checking account at Connecticut Bank Trust Company and made withdrawals as needed. She also was in charge of the separate savings accounts referred to as "Superbowl Accounts" that were accumulated from a portion of the weekly tournaments conducted by each tour. The Superbowl is a separate tournament limited to participants who have bowled in the requisite number of tournaments conducted by the various tours. When the time came to distribute Superbowl prize money, Mary Gaffney would withdraw money from the savings accounts, deposit it in the National Duckpin Tour's checking account in the Connecticut Bank Trust Company and then send checks or wire transfers from this account. Apparently Mary Gaffney used the checking account of the National Duckpin Tour as a general clearinghouse. When the plaintiffs or other investors sent money in the form of checks or wire transfers to the Gaffney home, such would be deposited in the National Duckpin Tour checking account.
The Amateur Duckpin Tour had its own corporate credit card from American Express. Both Joseph and Mary were authorized signatories. Joseph and Mary also had an American Express Gold card and an American Express Optima card. The credit cards would be used to charge travel expenses for all of the tours. For example, in 1987, Mary Gaffney charged $3,787.00 for business expenses to the National Duckpin credit card. On many weekends, Mary flew to Washington or Baltimore for tournaments. On occasion, Joseph used the Optima card for cash advances.
The Connecticut or Southern Division was organized by Joseph Gaffney before he and Mary met. She was a bowler in the Southern Division when Denise Barnes purchased the division from Joseph on February 1, 1985 and on September 10, 1983 when the plaintiffs invested in the division by entering into Exhibit "B".
Denise Barnes' written contract with Joseph Gaffney dated February 1, 1985 and introduced as plaintiff's Exhibit "U" CT Page 5871 recites that Denise Barnes, as purchaser, will assume all obligations of the following agreements: Chet and Mary Gaffney 50¢ per entry as long as the ABT is in existence, franchise agreement with ABT National Headquarters and financial agreement with Lou Guillemette. Incidentally, the paper on which Exhibit "U" was typed contains a logo of the Amateur Bowlers Tour, an address of P.O. Box 417, Wallingford, CT. 06492, and a telephone number of 203-269-2740. Joseph Gaffney also gave Denise Barnes a copy of his written contract with the plaintiffs pertaining to the Southern Division (Exhibit "B"). Mary Gaffney did not take part in the negotiations that resulted in the signing of Exhibit "U".
Before or when Exhibit "U" was signed, Joseph Gaffney informed Denise Barnes of Louis Guillemette's investment in the Southern Division. She was told of her obligation to pay Guillemette a royalty of 50¢ per entry for the next five years and that she was obligated to pay him $25,000.00 at the end of five years as Exhibit "B" required. In January 1989, Denise Barnes paid Louis Guillemette $25,000.00. She continued to send him royalty payments until sometime in 1992 when Joseph Gaffney directed her to transfer the 50¢ per entry royalty from Guillemette to him or to make the check payable to "Chet or Mary." Joseph Gaffney's comment at the time was "Lou had gotten enough money from us."
Denise Barnes had learned from Louis Guillemette of the plaintiffs' oral agreement whereby they had purchased Joseph Gaffney's royalties of 50¢ per entry for the life of the Southern Division. When she remonstrated with Joseph Gaffney about his order transferring the royalty payments to himself or himself and Mary, his response was that the agreement was verbal, the transaction was a loan and she should stay out of it Joseph also threatened that if his instructions were not followed he would consider the failure to pay royalties a default and would take over the business as permitted by a clause in Exhibit "U". In a letter that Denise Barnes received on January 24, 1992, Joseph Gaffney requested that future checks be sent to Mary Gaffney and promised to supply a lawyer if Denise Barnes were sued by Louis Guillemette. Another letter from Joseph Gaffney dated January 29, 1993 informed Denise Barnes that royalty checks were to be made payable to Mary C. Gaffney and sent to 1243 Yale Avenue, Wallingford, Ct. 06492. Denise Barnes' royalty checks to Joseph in 1992 amounted to $4,983.00, and to Mary in 1993 $3,992.50, in 1994 $4,087.00, and in 1995 $4,060.50. Usually the CT Page 5872 Southern Division holds weekly tournaments. From these tournaments, Mary Gaffney is presently receiving between $50.00-$90.00 each week.
Mary Gaffney called Denise Barnes, presumably after the divorce, to inform her that Mary Celotto was the name to put on the checks. Mary claimed to have put a total of $60,000.00 into Joseph's bowlers' tour business; $10,000.00 of the invested sum having been for the Southern Division. Joseph, according to Mary, had previously invested $10,000.00 entitling him to royalties of 25¢ per entry. Adding her $10,000.00 enabled him to raise the royalties to 50¢ per entry.
In terms of chronology, the plaintiffs' next investment was in the Amateur Candlepin Tour and the Baltimore Division of the Amateur Bowlers Tour as depicted by Exhibit "M" executed on October 18, 1985 by the plaintiffs and by Joseph Gaffney and Mary Gaffney. Two items noted previously bear repeating. In Exhibit "M" the plaintiffs were designated as investors and Joseph and Mary were designated as owners. Exhibit "M" is the first and only contract that imposes specific obligations on Mary.
Exhibit "M" was signed by the four parties thereto in the presence of each other. Mary identified her signature but could not recall the place or circumstances of the signing even though she had spoken to Joseph in Baltimore between her direct and cross examinations and purportedly the conversation had refreshed her recollection.
Mary's testimony was that she was ignorant of the workings of both tours involved in Exhibit "M". She named Judy Murphy as the purchaser of the Amateur Candlepin Tour and Mark and Joanne Johnson as the purchasers of the Baltimore Division of the ABT. The plaintiffs never recovered the money they had invested. The plaintiffs did receive $75.00 per week until April 1992, when the royalties were directed to Mary. Contrary to the designation of herself as "owner" in Exhibit "M", Mary Gaffney testified that she had never invested in either the Amateur Candlepin Tour or the Baltimore Division of the Amateur Bowlers Tour. She claimed that she received royalties because Joseph directed his purchasers to send them to her.
The next contract, in terms of time was Exhibit "LL", an investment of $20,000.00 in the Amateur Duckpin League signed by the plaintiffs and Joseph Gaffney on February 22, 1986. A CT Page 5873 provision in Exhibit "LL" is that the plaintiffs would pay $2,500.00 on February 2, 1986, $7,500.00 on March 15, 1986, and $10,000.00 on August 2, 1986. In actuality, the plaintiffs made a first payment of $5,000.00 in cash when the contract was signed. Louis Guillemette handed the money to Joseph who, in Guillemette's presence, gave it to Mary. When Mary received it she said "a lot of money." The second payment, also $5,000.00, and the third payment of $10,000.00 consisted of checks sent on March 14, 1986 and July 3, 1986 to Joseph Gaffney in Baltimore.
The plaintiffs never recouped their investment depicted by Exhibit "LL". Although Mary Gaffney's name does not appear in this contract, the Amateur Duckpin Tour was one where she had control of the checkbook and authority to sign checks and send wire deposits.
Following Exhibit "LL" is Exhibit "F" whereby on December 26, 1986, the plaintiff invested $20,000.00 in the Washington Division of the Amateur Bowing Tour. This contract was signed by the plaintiffs and by Joseph Gaffney and Mary Gaffney although it contains no obligation on the part of Mary.
On January 10, 1987, the plaintiffs invested another $10,000.00 in the Washington Division and Exhibit "J" was signed by them and by Joseph Gaffney and Mary Gaffney. Exhibit "J" was in substitution for Exhibit "F". It acknowledges an investment of $30,000.00 and increases the royalty per entry to 75¢. Like Exhibit "F", its predecessor, Exhibit "J" on its face, imposes no obligations on Mary Gaffney.
All the parties to Exhibit "J" signed the contract at the same time and in the presence of each other. Mary Gaffney was present as well during the negotiations that preceded the execution of the contract. The Washington Division was sold by Joseph to Emmit Seeney who until April of 1992 was sending royalties of $150.00-$160.00 per week to the plaintiffs. Thereafter the royalties, in amounts of 50¢ per entry, were diverted to Mary Gaffney. Other than the royalties, the plaintiffs have not received anything for their investment in the Washington Division. Mary Gaffney admitted that the royalties she received were not a return of investment because she had never placed any money in the Washington Division.
In a manner similar to their verbal purchase of "lifetime" royalties in the Southern Division, the plaintiffs upon a verbal CT Page 5874 agreement with Joseph Gaffney, invested an additional $20,000.00 in the Washington Division on November 28, 1988. For the extra $20,000.00 they were to receive royalties of 75¢ per entry for the life of the tour. And upon a separate verbal agreement with Joseph, the plaintiffs invested an additional $20,000.00 by two checks of $10,000.00 each dated December 23, 1987 and January 19, 1989 in the Baltimore Division for royalties of 50¢ per entry for the life of that tour. As mentioned previously, payment of royalties to the plaintiffs stopped when Joseph Gaffney directed his purchasers in 1992 to send the royalty payments to himself or to Mary Gaffney. All bowlers' tours founded and promoted by Joseph Gaffney are, at present, no longer in existence except the Southern or Connecticut Division which is operating under the ownership of Denise Barnes.
In addition to their investments, the plaintiffs made two loans of $3,000.00 and $10,000.00 to Joseph Gaffney. The $3,000.00 loan was for prizes for the Baltimore Division's "Superbowl" and has not been paid. The $10,000.00 loan was to enable Joseph Gaffney to pay some debts he incurred in Baltimore and return to Connecticut to run some howling alley. Joseph was supposed to repay the $10,000.00 at the rate of $70.00 per week but there was no penalty for early payment, which could have been made at any time. Joseph has paid only $1,050.00 by checks of the Amateur Duckpin Bowlers Tour. The last check of $70.00 dated October 23, 1989 was dishonored by the bank on which it was drawn.
Some further findings of fact have been made. These findings appear in subsequent sections of this memorandum.
 II.
At trial, counsel for Mary Gaffney argued that the oral agreements whereby the plaintiffs paid money for royalties during the life of a tour were unenforceable pursuant to the statute of frauds because they were not to be performed within a year. Section 52-550 provides "(a) No civil action may be maintained . . . unless the agreements or a memorandum of the agreement is made in writing and signed by the party, or the agent of the party, to be charged . . . (5) upon any agreement that is not to be performed within one year from the making thereof."
Although no reference to the statute of frauds appear in Mary CT Page 5875 Gaffney's brief and the claim made at trial could, therefore, be considered abandoned,[1] the court believes it sufficiently noteworthy for comment since the question of liability for the oral agreements must be determined. In Connecticut, only a contract whose completion within a year is inconsistent with the express terms of the agreement is within § 52-550(a)(5) the one year provision of the statute of frauds. A contract that does not say in express terms that performance is to have a specific duration beyond one year is, as a matter of law, the functional equivalent of a contract of indefinite duration and is outside of the prohibition of the statute. C. R. Klevin, Inc. v. FlagshipProperties, Inc., 220 Conn. 569, 580, 583 (1991). The oral agreements in this case fall into the second category as indefinite contracts because no lifespan was specified for any of the tours.
 III.
The plaintiffs, in seeking to hold Mary Gaffney liable, have in their brief, made sweeping allegations of a general partnership between her and Joseph. Mary's brief, in response, contains similar broadly worded contentions of how and why a partnership did not exist. In the court's view the question of whether or not Mary Gaffney is accountable to the plaintiffs must be decided by a separate review of each agreement.
Exhibit "M", the contract pursuant to which the plaintiffs invested $20,000.00 in the Amateur Candlepin Tour and the Baltimore Division of the Amateur Bowlers Tour, provides a suitable starting point. This contract was signed by the plaintiffs as investors and by both defendants under the designation of "owners". Identical obligations are set forth for both defendants whose name are connected by an "and/or".[2]
Mary identified her signature but claimed to have no recollection of signing the document and stated she was ignorant of its contents. She also testified to completion of high school and a more than adequate job performance when she was employed by the Southern New England Telephone Company.
The question of whether Mary Gaffney is liable to the plaintiffs on Exhibit "M" can be decided without resort to the law of partnerships. As a signatory to a contract that imposes obligations on her, Mary is responsible for the performance of those obligations. "The general rule is that where a person of mature years and who can read and write, signs or accepts a CT Page 5876 formal written contract . . . it is his duty to read it and notice of its contents will be imputed to him if he negligently fails to do so." Connelly v. Kellogg, 136 Conn. 33, 38 (1949). Exceptions to this rule do exist, see Ursini v. Goldman,118 Conn. 554, 562 (1934); DiUlio v. Goulet, 2 Conn. App. 701, 704
(1984), but "I forgot" or "I do not recall" is not one of them.Adam v. Consolini, 135 Conn. 321, 324 (1949).
Next to be discussed are Exhibit "F" and its successor, Exhibit "J". Pursuant to these contracts, the plaintiffs' payment of $20,000.00, later increased to $30,000.00, entitled Catherine Guillemette to receive royalties based upon tournament receipts in the Washington Division. Exhibits "F" and "J" were signed by both Joseph and Mary Gaffney. Unlike Exhibit "M", however, neither Exhibit "F" nor Exhibit "J" imposes any specific obligation on Mary as distinguished from Joseph. Mary argues that Exhibit "J" is unenforceable against her because of a lack of mutuality; the court disagrees.
"Mutuality of obligation" has been described as "only a semantical exercise surrounding the real determinant of a contract, namely, consideration." Clausen v. Theo, Hamm BrewingCo., 395 F.2d 388, 389 (8th Cir. 1968). Mutual promises are not essential where there is otherwise a sufficient consideration. Although consideration is essential, mutuality of obligation is not unless the want of mutuality would leave one party without a valid consideration for his promise. Thilo v. Deri, 17 Conn. Sup. 459,466 (1951). The consideration for the promises by the defendants in Exhibit "J" (and Exhibit "F") was the money paid by the plaintiffs when each contact was signed. There is no mutuality of obligation when a contract is unilateral. 3 R. Lord, Williston On Contracts, 4th ed., § 7.14, p. 287.
Thus Mary Gaffney is liable on all of the contracts that she signed, Exhibit "M" and Exhibit "J" (incorporating Exhibit "F"). At this juncture, it seems appropriate to set forth the reasoning behind the general rule holding a signatory to his or her contract. The law conclusively imputes to Mary Gaffney knowledge of the terms of the contracts she signed. Adam v. Consolini,supra. The rule has been described as being "wholesome and necessary". West v. Suda, 69 Conn. 60, 62 (1897). Without it, parties would be encouraged to deny knowledge, disproof of which would in many cases be impossible. Adam v. Consolini, supra.
 IV.
CT Page 5877
The plaintiffs' claim of partnership must be considered, however, for contracts signed only by the plaintiffs and Joseph, for oral agreements whereby the plaintiffs paid money for "lifetime" promises of royalties and for loans made by the plaintiffs to Joseph. "A partnership is an association of two or more persons to carry on as co-owners a business for profit." Gen. Stat. § 34-44(1). In establishing a true partnership, a mutual agency relationship is essential. Section 34-47 provides that to be a partnership within the Connecticut statutes, every partner has to be an agent of the partnership for business purposes. Travis v. St. John, 176 Conn. 69, 73 (1978).
Connecticut adopted the Uniform Partnership Act (1914) in 1961. P.A. (1961) No. 158. But a review of the pre- and post-uniform act cases shows little, if any, difference in how the existence of a partnership is to be determined when there is no express contract. The opinion in Block v. Administrator,Unemployment Comp. Act, 16 Conn. Sup. 444 (1950), states that the existence of a partnership relation is a conclusion reached from all of the subordinate facts. While it can't be said that any one fact is determinative, the essential question is whether the alleged partners have a relationship so that each is as to the others, in respect to some business, both principal and agent. Similar language couched in terms of findings of fact, reciprocal relationship and intent manifested by conduct appears in Travisv. St. John, supra; Burns v. Kuellmer, 11 Conn. App. 375, 380-81
(1987); and Wawrzynowicz v. Hudyma, New London J. D., No. 507239 (8/24/90).
A utilization of the factual approach leads the court to conclude that Mary did not become Joseph's partner for the Southern (Connecticut) Division despite the fact that division affairs were conducted from their joint residence. When closely related persons are involved, the facts and circumstances that existed between them do not have the same significance they would have had if these persons were strangers. Paolella v. Paolella,42 Conn. Sup. 184, 186 (1991); Block v. Administrator,Unemployment Comp. Act, supra. Aside from investing $10,000.00 of her own money, Mary had no input into the governance of the Southern Division, the affairs of which had been handled by Joseph and Denise Barnes who later became his successor. Mary Gaffney is not liable to the plaintiffs for any contractual defaults that may exist with reference to Exhibit "B". CT Page 5878
An opposite conclusion is reached concerning the contract known as Exhibit "LL". Although signed only by Joseph, Exhibit "LL" provides for royalties from the Amateur Duckpin Tour where Mary played a vital managerial role. From the facts previously found, the court is convinced that for the Amateur Duckpin Tour, Joseph and Mary acted for each other as principal and agent and intended to share in the Tour's profit and loss. Active Market,Inc. v. Leighton, 124 Conn. 500, 504 (1938); Landow Co., Inc.v. Maisano, 118 Conn. 214, 219 (1934); see Gen. Stat. § 34-45(4).
Liability for the three oral agreements for royalties for the life of a tour should follow the court's rulings concerning the written contracts to which they are related. The extra $20,000.00 invested in the Washington division and the extra $20,000.00 invested in the Baltimore Division are the responsibility of Mary as well as Joseph because her signature as well as his was on the two antecedent written contracts. Mary Gaffney, however, is not liable for the additional $20,000.00 that the plaintiffs paid on July 7, 1988 for royalties for the life of the Southern (Connecticut) Tour.
The court declines to hold Mary responsible for the loans of $3,000.00 and $10,000.00 that the plaintiffs made to Joseph. According to Louis Guillemette, the purpose of the smaller loan was represented by Joseph to be for Superbowl prizes and the larger loan was to pay Joseph's debts in Baltimore and return to Connecticut to operate a bowling alley. Mary, as was shown, had some involvement with the Superbowl tournaments but whether this money found its way into a tour or division is strictly a matter of conjecture. The court concludes that Joseph's repayment of $1,050.00 by checks of the Amateur Duckpin Bowlers Tour was of the same fungible nature that characterized all of his business dealings.
 V.
The plaintiffs suggest partnership by estoppel as an alternative means of holding Mary Gaffney liable. As a doctrine, partnership by estoppel is codified in Gen. Stat. § 34-54. Relevant to this case is language in subsection (1): "[w]hen a person, by words spoken or written or by conduct, represents himself, or consents to another representing him to any one, as a partner in an existing partnership or with one or more persons not actual partners, he is liable to any such person to whom such representation has been made, who has, on the faith of such CT Page 5879 representation, given credit to the actual or apparent partnership. " The statute is merely declaratory of pre-existing common law principles. See Active Market, Inc. v. Leighton,124 Conn. 500, 505 (1938); Morgan v. Farrel, 58 Conn. 413, 426
(1890).
Whether there has been a holding out of a person as a partner, so as to estop that person from denying the partnership, is always a question of fact. It must be shown that the person knew of the representation or facts must be found from which the person's knowledge and consent can be fairly inferred. Morgan v.Farrel, supra.
Mary Gaffney certainly represented herself to be a partner when Exhibits "M", "F" and "J" were signed and the plaintiffs invested money on October 18, 1985, December 26, 1986 and January 10, 1987, respectively. Her management of the finances of the Amateur Duckpin Tour provides facts to support an inference that Exhibit "LL", signed on February 22, 1986, also qualifies as a partnership by estoppel situation as do the related oral agreements for expanded periods of royalties in the Baltimore and Washington Divisions. To be a partner in a transaction, one is not necessarily required to be a signatory to documents. SeeTenney v. Insurance Co. of North America, 409 F. Sup. 746, 749
(S.D. N.Y. 1975). In concluding that a partnership by estoppel has been proven for Exhibits "M", "J" (incorporating "F") and "LL", and the related oral agreements, the court has considered the following facts as well as others: three of the four written agreements were signed by Mary; in one of the agreements Mary and Joseph are described as owners; Mary's was present during the negotiations and execution of the written contracts; Mary had authority and management of the Amateur Duckpin Tour account including her use of the account as a general clearing house for the checks of the plaintiffs and others; the temporal relationship of the contracts to each other and the fact that Mary invested $60,000.00 of her money in Amateur Bowlers Tours of which only $10,000.00 was for the Southern (Connecticut) Division.
 VI.
The court disagrees with Mary's contention of a variance between pleading and proof in the matter of royalties for the life of the Southern Division. It is true that the purpose of a complaint is to limit the issues to be decided at a trial and CT Page 5880 that the right of the plaintiff to recover is limited to the allegations of the complaint. Moore v. Sergi, 38 Conn. App. 829,841 (1995). Properly analyzed, however, there is no discrepancy between the allegation in the complaint of Joseph's tortious interference with the plaintiffs' right to receive royalties by his threats to Denise Barnes and the claim that in the receipt of the royalties Mary has been unjustly enriched that appears in the plaintiffs' brief.
Based on the evidence and factual findings, the court considers Joseph's tortious interference to have been proved.Sportmen's Boating Corporation v. Hensley, 192 Conn. 747, 754
(1984); Rotophone, Inc. v. Danbury Hospital, 13 Conn. App. 230,234-35 (1988). There can be no dispute that Mary received money to which the plaintiffs as opposed to Joseph were entitled. In what capacity or under what theory she received it is immaterial. The general rule is that an assignee of a non-negotiable chose in action acquires no greater right than was had by the assignor and simply stands in the assignor's place. 6 Am.Jur.2d, Assignments § 102, p. 282. See also Gen. Stat. § 42a-9-318.
 VII.
Mary Gaffney is not responsible for any contractual defaults that may exist with respect to the Southern (Connecticut) Division but she is liable to the plaintiffs for the royalties she received from Denise Barnes as the assignee of Joseph Gaffney. These royalties for the years 1993, 1994 and 1995 total $12,140.00. In accordance with the liquidated damage clauses of Exhibits "M", "J" (including "F"), and "LL", Mary Gaffney is liable to the plaintiffs in the amount of $82,500.00. The court concludes that the verbal agreements whereby the plaintiffs paid considerable sums for royalties for the life of bowlers' tours, the Baltimore and Washington Divisions are too indefinite, in terms of damages, to be enforced. Specifically, the court understands that in April of 1992, Joseph transferred royalties in the Baltimore and Washington Divisions from the plaintiff to himself or to Mary. But the court does not know how soon after April, 1992 the tours in the Baltimore or Washington Divisions ceased to exist.
Judgment is rendered in favor of the plaintiffs against the defendant Mary Gaffney in the amount of $94,640.00 plus taxable costs. CT Page 5881
Barnett, J.